May 26, 2021

**Supreme Court**

No. 2019-35-C.A.
(P1/17-3082AG)

State                :

v.                  :

Ezekial Johnson.        :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                               :

Ezekial Johnson.                   :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The defendant, Ezekial Johnson, was convicted by a jury of one count of first-degree murder (count one); one count of discharging a firearm during the commission of a crime of violence, to wit, murder (count two); and one count of carrying a firearm without a license (count three). He was sentenced to consecutive life sentences on count one and count two and ten years to serve on count three.

On appeal, defendant contends that the trial justice erred by (1) admitting in-court identification evidence; (2) limiting cross-examination; and (3) denying defendant's motion for a new trial. The defendant maintains that each of these errors entitles him to have his conviction vacated and be granted a new trial. After careful consideration of defendant's arguments and a thorough review of the record, we affirm the judgment of conviction.

- 1 -

# I

## Facts and Travel

On July 16, 2007, Jose Rodriguez was shot and killed while driving his taxicab. Over ten years later, on October 27, 2017, a Providence County grand jury returned an indictment charging defendant with one count of murder; one count of discharging a firearm during the commission of a crime of violence, to wit, murder; and one count of carrying a firearm without a license. A jury trial was held over two weeks in July 2018. At trial, the testimony revealed the following.

Rodriguez was employed as a taxicab driver for Gonzalez Cab; and, on July 16, 2007, he was dispatched around noon to transport a fare from Providence to Central Falls. While making the trip, Rodriguez spoke on the telephone to his wife, Anna,[1] and told her that the three men in his taxicab were behaving suspiciously.[2] Soon after Rodriguez shared his concern about the passengers, the call suddenly disconnected. Anna repeatedly attempted to call him back. Although she was unable to reach her husband, one of her calls did connect to his phone, and she heard someone laughing.

---

[1] There were inconsistencies in the record as to Anna's last name; accordingly, we use only her first name in this opinion. No disrespect is intended.

[2] Because Anna passed away in 2011, the details about her conversation with Rodriguez were elicited through the testimony of her daughter.

At around the same time, Lymari Gonzalez (Gonzalez) was standing outside her home on Garfield Street in Central Falls when she noticed a taxicab that "was going way too slow." Gonzalez turned to look at the taxicab and observed three men seated in the back seat. She watched the taxicab as it continued to drive slowly on Garfield Street and then turn right onto Fuller Avenue. After the taxicab turned the corner, Gonzalez heard a gunshot followed by the sound of a crash. Seconds later, she observed the three male passengers from the taxicab running towards her, while they were looking back in the direction of the taxicab; and she watched as two of the men flung the hats they were wearing into the bushes in front of the home at 99 Garfield Street.

Once the three men were out of sight, Gonzalez and her husband ran to the corner of Garfield Street and Fuller Avenue, where they observed that the taxicab had crashed. When Gonzalez approached the taxicab, she saw that the driver was still inside holding a cell phone and had blood coming down his neck. As other people arrived on the scene, Gonzalez returned to her home.

Later that day, Anna, who was still attempting to locate her husband, went to the hospital, where she learned that he had been shot and was on life support. Rodriguez was disconnected from life support and died the following day.

On the evening of the shooting, Gonzalez went to the Central Falls Police Department to report what she had witnessed, including the fact that she had watched

two of the men toss the hats that they were wearing into the bushes. Police officers showed Gonzalez a photographic array, but she did not recognize any of the individuals in the photographs as being the men whom she had seen in the taxicab. Two days later, upon her return to the Central Falls police station, Gonzalez was shown a different photographic array and identified two men she believed she had seen in the taxicab. Those men, however, were subsequently eliminated as suspects. After her second meeting with police, Gonzalez had no further contact with law enforcement until ten years later, in October 2017.

As part of the investigation, the Central Falls police obtained video taken from a surveillance camera at 114 Garfield Street, which showed Rodriguez's taxicab driving down Garfield Street towards Fuller Avenue around noon on the day of the murder.[3] Approximately a minute and a half later, the video showed "three black males" "running down Garfield towards Dexter." Police attempted to enhance the video for purposes of identifying the three men but were unsuccessful in doing so.

The police also seized the two hats that were thrown into the bushes in front of the home at 99 Garfield Street—one red and one black baseball cap. In 2009, the Central Falls police submitted the hats to the Rhode Island Department of Health

---

[3] Officer Nathan McGarry of the Central Falls Police Department testified that the time stamp on the video was off by "approximately 50 minutes" and that he had compared the time stamp to his watch in real time in order to determine that the actual time of the video recording was approximately noon, despite the time stamp on the video displaying "1:18[.]"

(RIDOH) for DNA testing. Although there was DNA found on each hat, the DNA was not compared to any reference sample at that time. Both hats were returned to the Central Falls Police Department along with their corresponding DNA analysis reports.

Nearly seven years after the murder, the police received information concerning Rodriguez's murder from Jon Thomas (Thomas), who subsequently entered into cooperation agreements to provide information in two other criminal cases. Thomas grew up on the south side of Providence and joined the YNIC "gang" around age thirteen.[4] According to Thomas, a few days after Rodriguez's murder, he met up with fellow YNIC members Jayquan Garlington (Garlington) and defendant. While the three were together, Garlington told Thomas that Garlington, defendant, and another YNIC member, Dwayne Morris (Morris), had taken a taxicab to Central Falls with the plan of getting out of the taxicab without paying the fare. According to Thomas, Garlington was upset when he was relaying the story because things had not gone as planned; Garlington told him that, instead of simply exiting the cab without paying, defendant pulled out a gun and shot the taxicab driver in the back of the head while the driver was talking on his cell phone. Thomas also recalled that Garlington had stated that, after the driver was shot, the men were laughing

---

[4] Due to the epithetical nature of the gang's full name, we will refer to the gang using only its acronym throughout this opinion.

because they tripped as they jumped out of the moving taxicab. As Garlington relayed the story to Thomas, defendant was laughing and "[n]odding his head up and down."

In 2017, the Central Falls Police Department sent the hats that were seized from the crime scene back to RIDOH for further DNA analysis. Senior Forensic Scientist, Tamara Wong (Wong), developed DNA reference profiles from buccal swabs taken from defendant, Garlington, and Morris. When Wong compared the DNA profile from the black hat to the DNA of defendant, she determined that the major component of that DNA was consistent with defendant's DNA, with the likelihood that it came from anyone other than defendant being "one in a hundred and twenty-eight quintillion."

## A

## Pretrial Motion to Suppress

At defendant's bail hearing on November 15, 2017, Gonzalez was called to testify and, for the first time, identified defendant as one of the men she saw in the taxicab.[5] On June 26, 2018, defendant filed a motion to suppress Gonzalez's in-court identification, on the basis that the identification procedure was impermissibly

---

[5] This Court was not provided a transcript of the November 15, 2017 bail hearing; however, it is undisputed that defendant did not object to Gonzalez's identification during the hearing, nor did he request an evidentiary hearing before the identification was introduced.

suggestive and resulted in identification evidence that was unreliable. Further, defendant argued that Gonzalez did not have personal knowledge with respect to defendant, and therefore she was not competent to identify him pursuant to Rule 602 of the Rhode Island Rules of Evidence.

On July 6, 2018, a hearing was held on defendant's motion to suppress. During the hearing, Gonzalez testified that, at around noon on July 16, 2007, "a traumatic thing * * * happened * * * that [she] just can't forget." She recounted that she had been standing on the sidewalk in front of her home on Garfield Street when a slow-moving taxicab caught her attention. She testified that she had observed three "youngish" men with "dark skin" arguing in the back seat of the taxicab and that she had stared at them as the taxicab passed within approximately six feet of her. Gonzalez further testified that, after she heard a gunshot, she watched the three men from the taxicab run down the sidewalk towards her. When asked if any of the men had looked at her while they ran down the sidewalk, Gonzalez responded in the affirmative and identified defendant in the courtroom as one of the men who looked at her that day. Further, she testified that she had stared at defendant as he crossed the street because she "knew something was going to happen[,]" and, thus, she focused her attention on defendant and could not forget his face.

On cross-examination, Gonzalez admitted that she could not recall where defendant was sitting in the taxicab, nor could she recall what defendant was wearing

as he ran down the street—including whether he was one of the individuals wearing a hat. She also confirmed that she had merely provided police with a general description of the suspects, reporting that all three were dark-skinned men who were approximately six feet tall and weighed about 150 pounds. Further, she acknowledged that, on July 18, 2007, she identified two individuals in a photographic array because she was certain that they were two of the men that she had seen in the taxicab and running down Garfield Street on July 16, 2007. She also testified, however, that she was never shown a photograph of defendant and had not seen defendant at any point between the murder in 2007 and bail hearing in 2017.

Moreover, Gonzalez testified at the suppression hearing that she recognized defendant as soon as she saw him at the bail hearing, stating,

> "When I saw him that day, when I came in, I got real
> nervous. My body was shaking. I tried not to look at him.
> And I was sweating. As soon as I look at his eye, I knew
> it was him. I tried not to look at him the rest of the case[.]"

On redirect examination, Gonzalez explained that, although she did not know defendant's name prior to the bail hearing, she knew defendant and his family from growing up in Central Falls. She also provided inconsistent testimony as to whether or not defendant was wearing handcuffs during the bail hearing.

In ruling on defendant's motion to suppress, the trial justice rejected defendant's argument that Gonzalez's identification was impermissibly suggestive due to the fact that defendant was the "only African American male at the [defense]

table, *and was shackled in handcuffs*." The trial justice explained that most federal circuit courts have rejected similar arguments and discussed *United States v. Thomas*, 849 F.3d 906 (10th Cir. 2017),[6] as one such example. The trial justice went on to discuss how, in *Thomas*, "[t]he eyewitness had never been asked to identify the robber before, and her in-court identification occurred more than 19 months after the robbery." He further noted that the defendant in *Thomas* "contended that the in-court identification * * * was unduly suggestive because he was the only African-American man at counsel table." The trial justice noted that the Tenth Circuit, however, held that the circumstances were not the product of improper conduct by law enforcement and that, therefore, the identification procedure was not impermissibly suggestive.

The trial justice concluded that the circumstances in *Thomas* were analogous to this case. He also found that there was no improper state action in this case, finding: "The [s]tate did nothing. [The defendant] demanded the bail hearing. [The defendant] didn't object to the identification when it was made in court. In fact, [defendant] capitalized her [*sic*] in cross-examination on her misidentification of two other individuals, knowing that she had previously misidentified other individuals."

---

[6] Although the trial justice referred to the case as "*United States v. Thompson*," it is clear from his recitation of the facts, issue, and holding that he was referring to *United States v. Thomas*, 849 F.3d 906 (10th Cir. 2017).

Next, the trial justice examined the reliability of Gonzalez's testimony utilizing the factors set out in *Neil v. Biggers*, 409 U.S. 188 (1972). *See Biggers*, 409 U.S. at 199-200. Under the first prong—the opportunity to view the defendant at the time of the crime—he found that Gonzalez had "full opportunity" to view defendant, as she was six feet away from the taxicab as it drove by "well below the speed limit" and "[e]ye contact [wa]s made."

Turning to the second prong—the witness's degree of attention—the trial justice found that Gonzalez was "very focused" on the car and its occupants. He noted that "she never took her eyes off the cab[,] [s]he stared at the occupants[,] [t]hey stared back[,]" and she even observed that the driver was on the telephone. Ultimately, the trial justice concluded that the witness's degree of attention was "extraordinary."

Examining the third prong—the accuracy of the witness's prior description of the defendant—the trial justice found that Gonzalez's memory of defendant from the neighborhood was "weighty." The trial justice deemed the third prong satisfied and dismissed defendant's assertion that Gonzalez had previously only given a general description of the three suspects and did not provide police with any distinguishing features. He further explained that "[t]hese are issues that go to the weight of her testimony that you can argue to a jury. It doesn't go to her incompetence to testify[.]"

- 10 -

Next, the trial justice concluded that the fourth prong—the witness's level of certainty in her identification at the time of the identification—had been satisfied, finding that "she walked into the courtroom at the bail hearing and virtually froze, in a cold sweat, as soon as she saw him."[7] As to the fifth and final prong—the length of time between the crime and the identification—the trial justice stated:

> "Yes, it's a decade. It's a long time. I know that. I can't explain why the police officer decided not to the [*sic*] show this lady a photo array, and it's going to be great food for you to argue to the jury as to why they didn't, and that her identification ten years later must be flawed because the police dropped the ball. That's argument [*sic*] that I will fully expect you to make."

Ultimately, the trial justice concluded that he was "well satisfied from the totality of the circumstances, and applying the *Biggers* factors, that this witness has demonstrated before [him], as a front-row observer, that her identification [was] based upon an independent reliable memory and not affected by any suggestiveness of the in-court proceedings[.]" He found that Gonzalez should be permitted to make another in-court identification, if requested by the state at trial, because there was "ample, sufficient, independent reliability inherent in her identification."

---

[7] The trial justice correctly noted that the level of certainty at the time of the identification is, as he described it, an "element that the courts have softened a lot." *See State v. Washington*, 189 A.3d 43, 58-59 n.12 (R.I. 2018) (recognizing that studies have shown "that a witness's confidence in his or her identification does not necessarily correlate with its accuracy" and acknowledging "that a witness's degree of certainty in an identification should be weighed with great caution").

In addition, the trial justice rejected defendant's argument that Gonzalez was not a competent witness under Rule 602 of the Rhode Island Rules of Evidence. He noted that this Court has rejected such competency claims, even in close cases. The trial justice then denied defendant's motion to suppress.

## B

## Trial

The defendant's trial commenced on July 9, 2018. At trial, the state presented testimony from sixteen individuals, including Lymari Gonzalez, Jon Thomas, and Marcus Gibbs (Gibbs). Gibbs, defendant's cousin, testified that in 2009 Thadious Parker (Parker), Morris, and defendant visited him at his home; and that, while the four men were together, defendant and Morris got into an argument after which defendant suggested "that things would have went differently if [Morris] didn't have information that could put him away for life." The defendant called Parker as his sole witness; Parker testified that he had never been present in a house with Gibbs and defendant. After hearing eight days of testimony, a jury found defendant guilty of all charges.

## C

## Motion for a New Trial

On July 20, 2018, defendant filed a motion for a new trial. During the July 30, 2018 hearing on defendant's motion, defendant argued that "there were quite a

few inconsistencies with" the testimony of the primary witnesses in this case—Gonzalez, Thomas, and Gibbs. With respect to Gonzalez, defendant emphasized that, days after the shooting, she had misidentified two individuals; he argued that inconsistencies in her testimony—including for how long she had observed the taxicab, varying descriptions of the height of the men in the taxicab, and her confusion over who threw the hats—all rendered her testimony "not worthy of acceptance[.]" As for Thomas, defendant claimed that Thomas's account of the meeting that took place with defendant and Garlington was "perplexing" because, according to Thomas, Garlington was agitated and defendant was not and was instead joking; further, defendant pointed to Thomas's claim that he had no interest in the case. Finally, regarding Gibbs, defendant averred that "either Thadious Parker was telling the truth or Marcus Gibbs was telling the truth" and claimed that the jury's decision to accept Gibbs's testimony was "mind-boggling[,]" given that Gibbs had testified that he was not in a gang but had an Ocean State Gang tattoo.

In rendering his decision on defendant's motion for a new trial, the trial justice acknowledged that "[s]ave for the DNA evidence, which is hardly to be ignored, this case was, for a major part, a credibility test of the [s]tate's witnesses: Jon Thomas, Marcus Gibbs, and Lymari Gonzalez, and the defendant's witness, Thadious Parker." Further, he explained that "inconsistencies between witnesses would not

preclude a determination that the witnesses were credible." He then reviewed the testimony and the evidence presented during trial.

With respect to Gonzalez, the trial justice found that she "was adamant that she saw the defendant in the back seat with two others in Jose Rodriguez's taxicab, and that he and the other two occupants also ran past her after she heard what turned out to be the fatal gunshot." Additionally, Gonzalez testified that she had seen the men running down Garfield Street, where two of the men discarded hats—one of which was later determined to have defendant's DNA on it. While recognizing that Gonzalez had previously incorrectly identified two other men, the trial justice noted that Gonzalez was never shown a photograph of Morris, Garlington, or defendant. Moreover, the trial justice found that Gonzalez's identification of defendant was "significantly strengthened because she had previously known [him] from the neighborhood." Further, the trial justice noted that Gonzalez "also described in chilling fashion how she felt when she walked into the courtroom at the bail hearing and saw [defendant]." Ultimately, the trial justice concluded that Gonzalez's testimony was credible and that the DNA evidence in combination with Gonzalez's testimony placed defendant at the scene of the crime.

The trial justice then turned to the testimony of Thomas, who "recounted the meeting he had with [defendant] and Garlington, where Garlington described the events leading up to the shooting, and described how [defendant] shot Mr. Rodriguez

in the head as he was talking on his cell phone." Further, he noted that Thomas testified, both during trial and at the suppression hearing, "that [defendant] was holding his head affirmatively and giggling" as Garlington recounted the event. Additionally, the trial justice noted that the cell-phone records and Rodriguez's daughter's testimony both corroborated Thomas's testimony that Rodriguez was on his cell phone at the time of the shooting.

Next, the trial justice discussed the testimony by Gibbs, finding that, "if accepted," the testimony was "inculpatory" because Gibbs "flatly uprighted [*sic*] and accused [defendant], his first cousin * * * of having killed an innocent cab driver." Further, the trial justice recalled that Gibbs testified that, in response to the accusation, defendant "simply responded by saying, 'I did what I had to do.'" Moreover, the trial justice found that "Gibbs satisfactorily explained" that the Ocean State Gang was a rap group and not a "group of violent people."

Finally, the trial justice briefly discussed the testimony of defense witness Parker. The trial justice noted that Parker "denied ever being in Gibbs's or [defendant's] presence, except for basketball games and having also seen [defendant] at a truck driving school." Additionally, the trial justice noted that Parker had "accumulated several convictions[.]"

Ultimately, the trial justice concluded that the "jury was offered a variety of testimony, and they opted to accept the testimony of Thomas and Gibbs, not Thadious Parker." Moreover, he stated:

> "From my perspective as a front-row observer, I frankly do not fault the jury in any way crediting the testimony of Thomas and Gibbs. Notwithstanding their criminal history and/or cooperation agreements, they offered unembellished and forthright testimony, which I did not find lacking in candor or credibility. To the contrary, their unvarnished testimony, despite severe cross-examination, had a distinct air and ring of credibility and the jury was well-warranted in accepting it.
>
> "So, too, the testimony of Lymari Gonzalez, who was an entirely disinterested eyewitness, offered credible testimony.
>
> "And Tamara Wong's expert analysis was not, in the end, helpful, in my view, in exculpating [defendant]."

Accordingly, the trial justice denied defendant's motion for a new trial. The defendant filed a timely notice of appeal on October 4, 2018.

## II

### Discussion

The defendant asserts several arguments on appeal. He maintains that the trial justice erred by (1) denying his motion to suppress Gonzalez's in-court identification; (2) limiting defendant's cross-examination of Thomas and Detective Jeff Araujo in violation of his rights under the Confrontation Clause; and (3) denying

- 16 -

defendant's motion for a new trial. We discuss each of defendant's arguments in more detail *seriatim*.

## A

## In-Court Identification

With regard to Gonzalez's in-court identification, defendant advances two lines of argument. First, he argues that, pursuant to Rule 602 of the Rhode Island Rules of Evidence, Gonzalez was not competent to testify because she lacked personal knowledge. Second, he avers that the trial justice erred in denying his motion to suppress Gonzalez's in-court identification because the identification was impermissibly suggestive and in violation of his due process rights.

## 1

## Rule 602

"A trial justice's ruling on whether 'the witness could not have actually perceived or observed the perpetrator' will be reversed only for an abuse of discretion." *State v. Hall*, 940 A.2d 645, 654 (R.I. 2008) (quoting *State v. Gatone*, 698 A.2d 230, 238 (R.I. 1997)). Rule 602 of the Rhode Island Rules of Evidence states, in pertinent part: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself or herself." "In deciding whether a witness is

competent for purposes of Rule 602, the trial justice must determine whether a witness had a sufficient opportunity to perceive the subject matter about which he [or she] is testifying." *State v. Ranieri*, 586 A.2d 1094, 1098 (R.I. 1991). The trial justice need not make a credibility determination nor judge "whether the witness is accurately and truthfully relating that which he [or she] perceived." *Id.* "Evidence should be excluded under this rule *only* if the court finds that the witness could not actually have perceived the subject matter of his or her testimony." *State v. Nhek*, 687 A.2d 81, 83 (R.I. 1997) (emphasis in original).

The defendant argues that Gonzalez was not a competent witness because "she readily admitted that she was observing a moving vehicle, the timeframe of observation was short," and "[t]here were three men to observe." Further, according to defendant, Gonzalez's previous misidentification of individuals in a photographic array is "strong evidence of [her] inability to recall the identity of the men in question[.]" We disagree.

This Court has long held "[i]n a situation in which the question of a witness's Rule 602 competency is close (that is, the jury could find that the witness perceived the matter testified to), the judge should admit the testimony since the matter then becomes one of credibility and is properly for the jury." *Ranieri*, 586 A.2d at 1098. We cannot say that the trial justice abused his discretion in the present case when he found that Gonzalez testified from her personal knowledge. The mere fact that

Gonzalez was observing a moving vehicle with multiple passengers for a short period of time relates to her credibility as a witness and not her opportunity to view the perpetrators. *See Hall*, 940 A.2d at 655 (holding that lighting conditions and the witness not wearing her glasses were issues relating to witness credibility rather than competence). We are well satisfied that Gonzalez had ample opportunity to view the perpetrators—both when they were in the taxicab and when they were running down the street—and that the trial justice did not abuse his discretion in determining that she was a competent witness.

**2**

**Identification Procedure**

"When reviewing a motion to suppress, we 'will not overturn a trial justice's factual findings unless they are clearly erroneous.'" *State v. Washington*, 189 A.3d 43, 56 (R.I. 2018) (quoting *State v. Harrison*, 66 A.3d 432, 441 (R.I. 2013)). "In our review of any alleged constitutional violation, we 'must make an independent examination of the record to determine if the defendant's rights have been violated.'" *Id.* (brackets omitted) (quoting *Harrison*, 66 A.3d at 441). "This independent examination requires this Court to 'view the evidence in the record in the light most favorable to the state.'" *Id.* (quoting *State v. Santos*, 64 A.3d 314, 319 (R.I. 2013)).

"In reviewing the denial of a motion to suppress an identification that was allegedly tainted by an unduly suggestive procedure, we carry out a two-step

analysis." *State v. Alves*, 183 A.3d 539, 543 (R.I. 2018) (quoting *State v. Franco*, 750 A.2d 415, 420 (R.I. 2000)). "First, we must determine whether the totality of circumstances discloses procedures that were so unnecessarily suggestive and conducive to irreparable mistaken identification that it constituted a denial of due process of law." *Id.* (quoting *Franco*, 750 A.2d at 420). "Only if we determine that the procedures were unduly suggestive do we proceed to the second step of our analysis and assess the reliability of the identification." *Id.* (quoting *Franco*, 750 A.2d at 420). This is because "even if a court were to find that the procedures were unduly suggestive, admission of tainted identification testimony does not violate a defendant's due process rights, so long as the identification possesses sufficient aspects of reliability." *Franco*, 750 A.2d at 420 (brackets omitted) (quoting *State v. Vanover*, 721 A.2d 430, 436 (R.I. 1998)).

The crux of defendant's argument in support of his motion to suppress was that Gonzalez's identification of defendant at the bail hearing was impermissibly suggestive because, at the time of the identification, defendant was the only African American seated at counsel table and was handcuffed. The defendant argues before this Court that allowing Gonzalez's in-court identification "did irreparable harm to the defendant's due process rights and the prospect of a fair trial."

"Most eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do." *Perry v. New Hampshire*, 565 U.S. 228, 244

- 20 -

(2012).  While we agree with the trial justice's conclusion that Gonzalez's in-court identification of defendant was not the result of unnecessarily suggestive circumstances arranged by law enforcement, we stop short of endorsing the trial justice's conclusion that "[t]he [s]tate did nothing."  After all, the prosecutor, who is unquestionably a state actor, called Gonzalez to the witness stand, in part to secure the in-court identification. *Cf. Spratt v. State*, 41 A.3d 984, 989 (R.I. 2012) (holding that an in-court identification made by a witness who recognized the defendant only after seeing him in the presence of two marshals in the courthouse was not impermissibly suggestive because there was "no evidence that police *or prosecutors*" orchestrated the encounter) (emphasis added).

The First Circuit Court of Appeals recently considered a case "involving a prosecutor's securing an in-court identification under supposedly suggestive circumstances" in *United States v. Correa-Osorio*, 784 F.3d 11 (1st Cir. 2015). *Correa-Osorio*, 784 F.3d at 19.  In its analysis, the First Circuit recognized that

> "[a]n in-court identification may be unduly suggestive if, for example, the prosecutor drew the witness's attention to the defendant (say, by pointing to him) or asked questions that suggested the hoped-for result, *or if the defendant looked different from others in the courtroom or at counsel table when the identification occurred (say, by being the only black person present).*" *Id.* at 21 (emphasis added) (footnote omitted).

Finding that the in-court identification in that case did not implicate these "constitutional danger zones," the First Circuit held that the defendant was unable

- 21 -

to establish that the in-court identification was impermissibly suggestive; thus, the *Biggers* test was not triggered. *Id.* at 21-22.

Arguably, one of these "constitutional danger zones" is implicated in the case at bar, because defendant had argued that, at the time of Gonzalez's identification at the bail hearing, defendant was the "only African American male at the [defense] table, *and was shackled in handcuffs*."[8] Even if we were to assume, without deciding, that the in-court identification here was impermissibly suggestive, that does not necessarily render the identification inadmissible, because "admission of tainted identification testimony does not violate a defendant's due process rights, so long as the identification possesses sufficient aspects of reliability." *Franco*, 750 A.2d at 420 (quoting *Vanover*, 721 A.2d at 436).

Having thoroughly reviewed Gonzalez's testimony, we hold that the trial justice did not err in finding that the identification had "sufficient aspects of reliability." *Franco*, 750 A.2d at 420 (quoting *Vanover*, 721 A.2d at 436). The trial justice properly "look[ed] to the *Biggers* factors to determine whether the identification was independently reliable." *Washington*, 189 A.3d at 58. After thoroughly examining each of the five factors, the trial justice found that Gonzalez demonstrated "that her identification [wa]s based upon an independent reliable

---

[8] We pause to note that defense counsel made no requests to avoid this factual scenario, such as moving to absent the accused during Gonzalez's testimony describing the assailants or other similar measures.

- 22 -

memory and not affected by any suggestiveness of the in-court proceedings[.]" We conclude that the trial justice, after considering the totality of the circumstances, was not clearly erroneous in his finding that the *Biggers* factors weighed in the state's favor, thereby rendering Gonzalez's in-court identification independently reliable and admissible at trial.

**B**

**Limitations on Cross-Examination**

The defendant also argues that the trial justice's limitation on witness cross-examination violated his Sixth Amendment right to confront a witness against him. More specifically, he identifies two instances of error with regard to cross-examination. First, he argues that his right of confrontation was violated when the trial justice declined to allow him to elicit statements that Morris had made to police through the testimony of Detective Jeff Araujo, because "Morris had asserted the Fifth Amendment" and was "thus rendered an unavailable witness." Second, defendant contends that the trial justice erred in limiting his inquiry into the subject of Thomas's ex-girlfriend's relationship with Garlington. It is defendant's position that cross-examination should not have been restrained on these issues because the testimony related to Morris would have "undermin[ed] the notion" that Garlington, Morris, and defendant were together on the date of Rodriguez's murder, and the

proposed Thomas line of inquiry "went straight to the heart of the motivation of the cooperator[.]"

"The ability of a defendant to meaningfully cross-examine the state's witnesses is an essential element of the due process guarantees of the United States and Rhode Island constitutions." *State v. Storey*, 102 A.3d 641, 648-49 (R.I. 2014) (quoting *State v. Lomba*, 37 A.3d 615, 621 (R.I. 2012)). "To satisfy the constitutional right of cross-examination, 'the trial justice is required to afford the accused reasonable latitude to establish or reveal bias, prejudice, or ulterior motives as they may relate to the case being tried.'" *State v. Clark*, 974 A.2d 558, 575 (R.I. 2009) (quoting *State v. Bustamante*, 756 A.2d 758, 765 (R.I. 2000)). "However, once sufficient cross-examination has been permitted to satisfy the constitutional safeguards, the trial justice is vested with discretion to limit the scope of additional cross-examination and that decision will not be disturbed by this Court absent an abuse of discretion." *Id.* It is within the trial justice's discretion "to sustain objections to lines of inquiry that are 'potentially misleading or irrelevant, that offer little or no probative value, or that exceed the scope of direct examination[.]'" *Storey*, 102 A.3d at 649 (quoting *State v. Wright*, 817 A.2d 600, 610 (R.I. 2003)).

## 1

## Morris

We need not reach the merits of defendant's Confrontation Clause argument with respect to Morris, because this argument has been waived.[9]  At trial, defendant did not raise a Confrontation Clause argument but, instead, merely argued that Morris's statements to police were probative and therefore admissible under the Rules of Evidence.  "It is well settled that the raise-or-waive rule precludes us from considering at the appellate level issues not properly presented before the trial court." *State v. Andrade*, 209 A.3d 1185, 1194 (R.I. 2019) (quoting *State v. Cahill*, 196 A.3d 744, 753 (R.I. 2018)).

## 2

## Thomas

During the defense's cross-examination of Thomas, defendant introduced a photograph of Renee Rogers, the mother of Thomas's child.  Upon introduction of the photograph, the state immediately requested a sidebar conference, during which the following exchange occurred:

"THE COURT: Okay. And where are we going with this?

---

[9] This Court has previously held that "[w]hen a witness refuses to testify and invokes a legitimate Fifth Amendment privilege, the Sixth Amendment Confrontation Clause no longer applies because the witness is unavailable." *State v. Ramirez*, 936 A.2d 1254, 1265 (R.I. 2007) (citing *California v. Green*, 399 U.S. 149, 167-68 (1970)). As such, even if defendant's argument with respect to Morris were not waived, the argument would still swiftly fail.

"[DEFENSE COUNSEL]: He found out that she was cheating on him with Jayquan Garlington, and he has absolute detest for Jayquan Garlington due to the fact that she carried on an affair with him that he didn't know about, and he has stated to many others and has made public that he would do anything he had to do to get back at Mr. Garlington for having this affair with his girlfriend. And I think the jury should be entitled to know that.

"[PROSECUTOR]: Judge, this is the first we're hearing this information again, but I think it confuses the issues completely. This is not Jayquan Garlington's trial, this is Ezekial Johnson's trial. It's totally going to mislead the jury and totally confuse the issues about who is having an affair with who, and, I mean—he's providing information as Ezekial Johnson [*sic*] in this case.

"[DEFENSE COUNSEL]: And they're using a statement, supposedly that he says that Jayquan Garlington made—

"* * *

"[DEFENSE COUNSEL]: —to bury my client and to have him try [*sic*] to have him convicted.

"THE COURT: The point is not necessarily what Jayquan Garlington said. It's your client's reaction to the story that is attributed to Jayquan Garlington. Even if he made up a story about what Jayquan Garlington said, and I don't know that I can make that decision, it's the action of Ezekial Johnson that is paramount. I'm going to sustain any objection to going into that business about Jayquan Garlington having an affair with his girlfriend."

We see no error in the trial justice's decision to exclude this line of questioning, because the issue of Thomas harboring a grudge against defendant's alleged co-conspirator "is so tenuously related, if at all, to the issue of [his] possible

- 26 -

bias against defendant[.]" *State v. Veluzat*, 578 A.2d 93, 95 (R.I. 1990) (holding that the trial justice did not abuse his discretion in excluding questioning about witness's grudge against the defendant). Moreover, defendant was afforded "reasonable latitude" to establish biases that Thomas might have—including Thomas's involvement in and benefit from cooperation agreements, his relationship with law enforcement, and the benefits he received through his participation in the witness protection program. *See Clark*, 974 A.2d at 575 (quoting *Bustamante*, 756 A.2d at 765). After a careful review of Thomas's testimony, we are satisfied that sufficient cross-examination was permitted to satisfy the constitutional safeguards, and that the trial justice did not abuse his discretion in excluding questions about Thomas's possible grudge against Garlington.

## C

### Motion for a New Trial

Finally, defendant argues that the trial justice erred in denying his motion for a new trial because, according to defendant, "the evidence failed to establish any culpability of the defendant beyond a reasonable doubt." In support of this argument, defendant claims that there were "manifold inconsistencies" in testimony, specifically pointing to the testimony of Gonzalez, Thomas, and Gibbs. Further, defendant avers that "the jury should not have been exposed to [Gonzalez's] in-court

identification[,]" and that the DNA evidence did not establish that defendant was at the scene of the crime.

When presented with a motion for a new trial based on the weight of the evidence, the trial justice "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Gumkowski*, 223 A.3d 321, 328 (R.I. 2020) (quoting *State v. Johnson*, 199 A.3d 1046, 1050-51 (R.I. 2019)). "The trial justice must consider the evidence in light of the jury charge, then independently assess the credibility of the witnesses and the weight of the evidence, and also ultimately determine whether he or she would have reached a result different from that reached by the jury." *Id.* (quoting *Johnson*, 199 A.3d at 1051). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Id.* (quoting *Johnson*, 199 A.3d at 1051). "Only when the trial justice does not agree with the jury's verdict, must he or she embark on a fourth analytical step." *Id.* (quoting *Johnson*, 199 A.3d at 1051).

"This Court's review of a denial of a motion for a new trial is deferential because the trial justice is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Gumkowski*, 223 A.3d at 328 (quoting *Johnson*, 199 A.3d at 1051). "If the trial justice has articulated adequate grounds for

denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." *Id.* (quoting *Johnson*, 199 A.3d at 1051).

In denying defendant's motion, the trial justice began by acknowledging that "[s]ave for the DNA evidence, which is hardly to be ignored, this case was, for a major part, a credibility test of the [s]tate's witnesses: Jon Thomas, Marcus Gibbs, and Lymari Gonzalez, and the defendant's witness, Thadious Parker." Further, he correctly explained that "inconsistencies between witnesses would not preclude a determination that the witnesses were credible." *See State v. Lopez*, 129 A.3d 77, 85 (R.I. 2016) (holding that testimonial inconsistencies do not necessarily discredit all of the witness's testimony). He then considered each witness's testimony and explained the reasoning for his credibility assessments.

Regarding Gonzalez, the trial justice recognized that Gonzalez had incorrectly identified two other men; however, he emphasized that she was never shown a photograph of defendant, Garlington, or Morris. Further, the trial justice explained that Gonzalez's "identification of the defendant was significantly strengthened because she had previously known [defendant] from the neighborhood[,]" and she described "in chilling fashion how she felt when she walked into the courtroom at the bail hearing and saw [defendant]." Ultimately, the trial justice concluded that Gonzalez testified "with the utmost conviction," which he found to be credible.

Next, the trial justice turned to the testimony by Thomas and Gibbs. First, he found that cell-phone records corroborated Thomas's testimony that Rodriguez was on his cell phone at the time of the shooting. Second, the trial justice acknowledged that Gibbs had outright "accused [defendant] * * * of having killed an innocent cab driver." He explained that Gibbs had "satisfactorily explained his tattoo of the Ocean State Gang as a rap group" and had also explained the "dissimilarities" in his testimony. The trial justice declined to fault the jury for crediting the testimony by Thomas and Gibbs, stating, "[n]otwithstanding their criminal history and/or cooperation agreements, they offered unembellished and forthright testimony, which I did not find lacking in candor or credibility."

With regard to the evidence presented, the trial justice found that the DNA evidence in conjunction with Gonzalez's testimony placed defendant at the scene of the crime. Further, he explained that "[t]he jury was free to conclude that someone other than [defendant] had worn the hat last and tossed it, but obviously the fact-finders determined that it was [defendant], not some unknown person who had that hat on that day and had discarded it while running down Garfield Street." Additionally, he noted that "Tamara Wong's expert analysis" was not helpful in exculpating defendant and that cell-phone records corroborated the testimony by Rodriguez's daughter concerning her mother's last phone calls to her father.

Having thoroughly reviewed the entire record, as well as the trial justice's decision denying the motion for a new trial, we are satisfied that the trial justice has articulated adequate grounds for denying the motion and that he did not overlook or misconceive material evidence. Accordingly, we hold that the trial justice properly denied the defendant's motion for a new trial.

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction. The record in this case may be returned to the Superior Court.



.STATE OF RHODE ISLAND

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Ezekial Johnson. |
| **Case Number** | No. 2019-35-C.A. (P1/17-3082AG) |
| **Date Opinion Filed** | May 26, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State: <br><br> Mariana E. Ormonde <br> Department of Attorney General <br> For Defendant: <br><br> George J. West, Esq. |